Before we do this, Baron, you were court-appointed, and I want to thank you for accepting the appointment of the court and for discharging your responsibility very well this morning. It was my honor. Thank you. Thank you. Okay. Whitesell Corporation v. Electrolux Home Products, Inc. Mr. Lattken. Thank you, Your Honor. I may please the court. I'd like to focus on two issues. The district court's contract rulings, which twice invalidated contractual scope as indefinite for want of a meeting of the minds. And second, evidentiary errors that occurred on the vastly narrow trial that did occur. Beginning with the contracts, the district court's indefinite ruling was inconsistent with the contract's clear text, industry custom and usage, and premature given that discovery had barely begun. Because section 2.1.2 of the contract sets forth the scope. It says that Whitesell will meet all of defendant's requirements for specified listed categories of parts. I think this is your strongest argument this morning. Pardon? I think this is your strongest argument this morning. But here's the problem I had from the briefing, okay? I couldn't tell what difference it made. It seemed to me what the district court allowed you to do was to show at trial how there were goods from a course of conduct that they would have been expected to buy from your client. And you could make your case on that. And I'm not sure how this indefiniteness ruling made a difference, okay? You never explained in your brief really how it made a difference. And if we were to send it back for a new trial on that issue, what goods would we be talking about, what would happen as a result of it? It seemed to me just a total failure on the briefing. So, Your Honor, the only – the district court allowed for it to go forward, the courts of dealing, where the goods were actually delivered and sent over. But the claims that got cut out were the ones where they failed to – where defendants failed to transition over, failed to order from us, failed to buy from us a vast quantity of the goods. It's a huge number of goods where they simply did not order and transition from us. And so, for example, if you looked at docket 172604, there's a spreadsheet there. Do you mind tilting the microphone up? Yes. Thank you. My apologies. It would be docket 172604 is a spreadsheet. And it shows the categories, exemplary types of things that were just simply not transferred over to us. And therefore, we had no ability to supply. And therefore, they didn't end up in the course of dealing. And that's the vast majority of the parts at issue, Your Honor. And so that's deeply prejudicial to cut out from the case the vast majority of the parts. And it simply doesn't make sense to say that there's – that these parts, the descriptions are indefinite. Fasteners, threaded fasteners, that's screws, nuts, bolts, clips, clamps, spacers. I know what those mean. If you walk into the Home Depot and you'd say, I would like the threaded fasteners, they'll say aisle nine. They won't say, what do you mean? And these have discernible meanings. We're not talking here about sort of the platonic ideal definition of these parts. It's starting with these are the products – these are the parts that are used to make defendant's products. And so when looking at those products, the question is, can you tell whether something in that product is a clamp, it's a spacer, it's a nut? And if you can, then it's sufficiently definite and the contract is enforceable. And that's especially true – you just simply can't have the extreme determinacy here to invalidate a contract. The notion that we just have no basis for looking at the contract and at the products and understanding which parts are within that definition. So can you use a subpart B unnecessary to enforce this contract? Yeah. So Exhibit B doesn't define the scope of the contract. It simply tracks what's going on, and that's actually clear from the text of the contract itself because the contract under definitions starts by giving a definition. It says that the goods shall mean, and then it lists all the categories – the clamps, the spacers, everything else that's included. And then after that, it sets forth an expectation. It says these goods – so it's accepting the definition of goods – these goods shall be listed on an Exhibit B. If the Exhibit B were meant to define the scope of the contract, then the definition at the beginning would have been unnecessary. It would have said the contract covers everything listed in Exhibit B. It wouldn't have said, here's what it covers, and then parties, you're going to list these on Exhibit B. Is the creation of Exhibit B a kind of separate responsibility from the obligation to purchase those goods? Is that what you would say? Yeah, I think it's a separate expectation that it was expected that they would be tracking these things. You can get rid of things that are no longer needed, add things. But it isn't the essence of the contract. It doesn't define the scope of the contract. It simply tracks performance. And one of the ways you can tell that is the party's performance. The parties went forward with this contract for years, exchanging – with billions of parts transferred. And nobody stops and says, gee, I can't tell what the contract means because there's no Exhibit B. And it's really hard to reconcile. We paid $2 million at the assumptions contract. It's hard to reconcile us paying $2 million for a contract where there was no content. Everybody understood there was no content, and Exhibit B was simply a mechanism for tracking what was going on and keeping it all up to date. But there was only a partial performance, you would say, right? Walk me through how the parties complied with the contract and also didn't comply with it. I'm sorry, could you repeat that, Your Honor? You've said that we know that Exhibit B wasn't necessary because the parties complied with the contract. But, of course, we wouldn't be here if your client thought the parties had completely complied with the contract. That's right. Yeah, so the parties did get into disputes. But the disputes concerned things like whether a particular plant was covered by the contract. And that was resolved early and the case was added. The parties got into disputes over whether certain things at the margin qualified, wire forms was in dispute, and that was resolved in our favor. But the fact that there were disputes at the margin about the scope of the contract doesn't mean it was indeterminate as a whole, that the parties just had no concept of what it covered. The language in the contract itself makes clear that you have clamps, spacers, et cetera. Even the phrase, Class C parts, had an industry-understand meaning. And I think the district court simply overlooked our textual cues about it. And the first is that, again, we're only looking at defendant's products and figuring out what in those products are Class C. But it also appears, after you've listed clamps, spacers, washers, that type of thing, and it appears in the phrase, and other Class C items in similar families. So the only question for the Court was, looking at things that are in similar families to that which was already listed in defendant's parts, is there some basis for figuring out if they're Class C or not? And there is a basis for doing that because the parties in essence agreed on the meaning of Class C. For example, defendant's own employee, Don Market, who was the VP of Procurement, said the typical definition of a Class C item, typical definition, is low-dollar parts, penny parts, what I call non-critical components. Hopi, as Director of Marketing, and this is at tab 1726-2, explained that all inventory, all inventory, is classified as A, B, or C. The notion that the parties would have no way of knowing whether or not these parts were covered by the contract when they described spacers, clamps, Class C parts of similar rents, it simply defies credulity. And there was also a presentation before, as the parties were negotiating this contract, and at the presentation, and this is docket 162-12, pages 4 to 5, and at the last four pages of that docket, that lists exemplary Class C parts. It's just simply incorrect, the notion that somehow or another the parties didn't understand what was in it. And in fact, when this litigation began, at its outset, defendants and we both sued to enforce the contract, not to invalidate it. And the defendants said in their motion for summary judgment, and I'm quoting, they clearly expressed the intent of the parties' original agreement, which unambiguously described its subject matter. Unambiguously described its subject matter. It was only when the district court suggested, gee, I think that there's enough disputes here that I don't think that this is actually definite, that suddenly everybody changed course, and defendants began arguing that it was insufficiently definite. Even apart from this, Your Honor, the ruling was at least premature because discovery had barely begun. And that was the type of discovery, and I've read you the type of quotes, that showed that there was a shared understanding, an industry understanding of the critical terms in the contract. Finally, if I may turn very, very briefly to trial error, which I understand, Your Honor, Chief Judge Pryor, that perhaps is not my strongest, but we don't think that that can be sustained either because the district court abused its discretion in excluding from the trial, excluding from the trial a defendant's intent to breach the contracts, the fact that there was nonpayment of invoices with no excuse, and that defendants were moving to other suppliers in violation of their contract. And it was... My issue, though, was that I'm not sure how those evidentiary issues ended up applying to the claim that was left. Yeah, and I think it's actually critical in this case because the dispute was about transitioning Bruner parts, and our argument was that Hopi had not transitioned them because they wanted to go to other suppliers. They were in bad faith, just didn't want to give White Cell any new business, as the emails say. Hopi's position on this was, you were not production ready. You were not ready to prepare them for us. And our argument was, no, that is simply a subterfuge. It's a pretext. There is no industry standard for production readiness that you have invoked. And so all this goes to the credibility question of, is it truly production readiness that caused them not to bring the Bruner parts over, or was it that they just really wanted out the contract and just weren't going to give White Cell any new business? If I could reserve the remainder of my time for rebuttal, thank you very much. You have five minutes. Mr. Charles. Morning. May it please the Court. My name is Adam Charnas, and I'm arguing for Husqvarna and Electrolux. The district court admirably handled this complicated and contentious case over the course of more than 20 years, and none of the alleged errors briefed or argued by White Cell justifies turning back the clock 17 years to 2008 or otherwise reopening the litigation that's been settled. Now, the fundamental problem that White Cell has in its argument this morning is that my good friend, Mr. Lampkin, didn't mention once the settlement memorandum. And the settlement memorandum comprehensively restated the categories of goods that were subject to the SPA. Before I get to the settlement memorandum, I do want to address, Chief Judge Pryor, your opening question, which is what difference does this make? I mean, look, the reason I said this is the strongest argument is I'd like for you to consider these propositions of Georgia law. The law leans against the destruction of contracts on the ground of uncertainty, and the uncertainty and indefiniteness at issue must be extreme to warrant the conclusion that a contract cannot be enforced. The law does not favor destruction of contracts on grounds of uncertainty. Indefiniteness in subject matter is so extreme as not to present anything upon which the contract may operate in a different, in a definite matter. I'm not sure that that was what we had here. Well, let me address that in two ways. First of all, my friend quoted a number of the items in 2.1.2 as suggesting that they were obvious. And I agree with him in part. Everybody understands what a nut is and what a fastener is. And we purchased all of our nuts and fasteners and the other obvious elements from Whitesell from the get-go. And they admit this in both of their briefs. They say within a year or two, when the transition period was long, we transitioned to them, purchased from them all of our fasteners and other things like that and all of our related Class C items. The dispute was over the words like components and some components and other types of material. We said this is a contract, as the definition in 2.0 says, about cold-headed threaded fasteners and related Class C items. I don't think there's any dispute between the parties that we bought all those from them. We bought $60 to $70 million of parts per year from them. We had a trial in the course of conduct. And what the district court said was, and I think the question about whether the SPA itself is indeterminate is largely academic because of the settlement memorandum. The settlement memorandum says it existed, was signed, to resolve the parties' disputes at that time. And the main dispute was over what goods were covered. Because what White Soil has repeatedly done in this case, it did it with the SPA, it did it with the settlement memorandum, is what we think we have a concrete agreement over specific items and then immediately, immediately they blow up, try and blow up those definitions. For example, the reason we couldn't agree on Exhibit B initially is because they put things like owner's manuals on it. They took the term components and subcomponents literally as anything in the world that goes into your products or sent to customers we have to provide to you. And owner's manuals, we say, plainly don't fall in this contract. So the settlement memorandum reconceived the parts, supplanted the definition in the SPA and basically set up three categories, parts in clarified Exhibit B, parts in B1, and then parts in B2. And so looking at the SPA itself, you know, misses the point. It's the settlement memorandum. Why not discovery at least over the settlement agreement? Well, because that would disclose nothing of relevance here. It's interesting that, you know, they say Class C parts are the obvious definition. Well, that is we transfer all of the Class C parts to them that were related to fasteners and nuts and things like that. And there's no dispute about that. And the settlement memorandum categorizes five specific categories, okay, and says those are transferred. And then it had Exhibit, what's called Exhibit B2, which is everything else. So if it's an everything else category, it's purely voluntary. The settlement memorandum says everything else other than those five categories is only things that we want to buy from them and that they're willing to sell to us. So that really definitively shows that anything outside of those five categories is not required to be part of the contractual relationship. Now, of course, the district court found that two of those categories were itself were themselves ambiguous, the wire forms and the parts in the process of being transitioned. But the Court enforced the part. By that point, by the part of the time of the 2008 summary judgment, the parties had been in a contractual relationship for many years and, as I said, had purchased tens of millions of dollars. We had purchased tens of millions of dollars of parts from them each year, and the Court enforced the contractual relationship to that extent. So I'm not sure if that answers your question, Judge Grant, but the two issues that were really the two issues that remained after the Court's 2008 order are related to only wire forms and parts in transition. But even if that's so, couldn't discovery have informed whether the parties had an understood meaning of those terms and whether they had an agreement with respect to those classes of items? Well, let me take each one in turn. With respect to parts being transitioned, I think there are two issues. Number one, the settlement memorandum expressly required Whitesell to produce a list of parts being transitioned, and Whitesell never did so. So any failure to create a list of those parts, which became part of Exhibit, clarified Exhibit B, is Whitesell's responsibility. They never produced that list. Well, that's good. That's a good question, maybe. Was it part of the agreement, or was it just kind of an arm of the— I don't know how to say it, right? Was it necessary to the agreement, or was it, as your friends on the other side say, at least with respect to the initial contract, was it just kind of a record-keeping document almost? Well, I think it was part of the agreement. I mean, this is on page 1 of the settlement memorandum, which is their addendum, page 24. Element B of the clarified Exhibit B was part numbers for parts in process of being transitioned, a list of which will be prepared by Whitesell as soon as possible. Whitesell never did that. I'd also suggest to the Court that that category is essentially a null set. And the reason I say that is, under the SPA, which many provisions, most provisions of the SPA continued in force even after the 2008 summary judgment order, there was a—as you'd expect, there was a qualification process. We don't have to take products from them that don't meet our quality standards. And so all parts that were transitioned went through a quality process. Once they passed that process, and tens of millions of dollars of parts a year did, we would then send them notice of approval and send them a purchase order. All products that passed the quality process and for which we sent a purchase order, we treated as part of the course of dealing. We purchased those products from them. So the only products that were sort of in process that we didn't purchase from them were products that didn't pass the quality process. And under the SPA, we were never required to buy those products from them. So I think the— Do you think that Exhibit B plays the same role within both the SPA and the settlement agreement? I think the answer is yes. And I think counsel spoke about Exhibit B in the court question, so I'll turn to that. Exhibit B had two roles. It is true, as counsel argued, that one of Exhibit B's roles going forward was tracking products. Products came in and out of the relationship. The defendants had new products. They revised products that required different parts. So new parts came in, old parts came out. That was certainly one of the roles of Exhibit B. But Exhibit B played a critical role from day one of the SPA, and that was to list the products that were subject to the party's contractual relationship. And most importantly, list the price. The initial price was supposed to be on Exhibit B. So Exhibit B wasn't just a tracking mechanism going forward. And Exhibit B was also the canary in the coal mine with respect to the party's fundamental disagreement about the products that were subject to this arrangement. And, you know, my friend said, well, there was disputes at the margin. That's absolutely untrue. We purchased from them $60 million to $70 million worth of products per year. Their claim is it should have been $650 million. Ten times more products in dollar volume they claim we should have purchased. So the disputes here were not at the margins at all. They took the position that anything that was a component of our products, anything at all, we had to buy from them. Not just fasteners. If you read the contract, Section 2.0, it's a contract about fasteners. But somehow they morphed that into saying that we had to buy tape from them, bags from them, anything at all that was used to produce our products. And they did so based on the terms that were indeterminate, components, subcomponents, and the like. That's what they latched onto during the litigation. That's what their discovery request basically asked for our purchasing records with respect to every single product, every single product, excuse me, that went into making our products, including bags and tape and manuals and things like this, which we think are plainly outside of the scope of the contract. And if the parties can't or so far apart, I think that's what led the district court to conclude that the terms like components and subcomponents were indeterminate. That's one thing that's tripping me up, though, is that it's my understanding of the record that it was not your client's argument that the contract was completely indeterminate until the district court suggested that idea. And then obviously there's no reason perhaps not to jump on board at that point. But does your course of litigation or course of conduct suggest that your client really didn't believe that it knew in any sense what it had agreed to? Your Honor, I think that's half true. We did not use the term indeterminate at summary judgment. We used a different route to get to exactly the same place that the district court did. The district court started at the SPA, said it's indeterminate. So, well, wait a minute. Then you have a settlement memorandum. That makes it determinate as to certain categories, and I'm going to enforce that. Our briefing at summary judgment slipped the first step. We didn't focus on the SPA by itself. Because there was a settlement agreement. Because there was a settlement memorandum. We said, look at the settlement memorandum. It has five categories. Three of those are determinate. Plus, we agree that anything that we've been buying from them, whether it's in the settlement memorandum, because the settlement memorandum was years before summary judgment, anything we've bought from them since then, we agree is part of the party's contractual relationship. So the district court ended up essentially where we argued all along. It took a little bit of a circuitous route to get there by going through the SPA by itself. But it's not correct that the end result is different than what we were arguing all along during the summary judgment process. With respect to, I'll just briefly discuss the evidentiary issues that my friend mentioned very briefly. Those are obviously all reviewed for an abuse of discretion. I don't think there's any indication in this record that the district court abused its discretion. The e-mails, for example, that the district court excluded were from years before. They discussed disputes that were different than the ones that were tried at the recent trial. They were written by different, at the time, Husqvarna and Electrolux were different, essentially different divisions of one company. They then separated. They were written by employees of a different company that had no relation at all to Whitecell's claims at trial. So for these reasons, in the course of managing the trial, we think the district court did not abuse its discretion. The other important thing is Whitecell has not shown any prejudice from any of these errors. After all, they prevailed on their breach of contract claim, Count 1, or Claim 1 that went to the jury. They ultimately, they convinced the jury that we breached the contract. They lost because the jury found an affirmative defense present. So since they prevailed on their claim, it's hard to see how they were prejudiced by keeping, and the district court kept these documents out. If there are no more questions, I thank the Court. Mr. Lamkin, you've saved five minutes. Thank you, Your Honor. I would like to begin with what was transitioned and what wasn't in terms of the settlement memorandum. In terms of what was transitioned, that is fundamentally in dispute. It's hard to understand what the district court was doing when it was saying that this is all indeterminate, that we don't know what class C parts in, that we don't know what fasteners are, if all that had been actually transitioned. And what happened is, if you look at Docket 172604, that's a list of exemplary things that were transferred. But there was no discovery on what transitioned and what didn't because the district court terminated everything about the SBA Section 2.1.2 at the outset of the case without any discovery. So we don't have that back and forth, and the parties haven't developed what did and didn't get transitioned. But we believe, and I think that the docket number I point to, that a huge number of the parts never got transitioned. With respect to components, subcomponents, and other materials, Your Honor, I don't believe that's what this case was all about. We do think we know what that means. It's talking about components and subcomponents, whatever materials they made of, of the listed parts, not just any component or any subcomponent at all. But even if that were indeterminate, consistent, Chief Judge Breyer, with what you were saying, what the Court would be required to do would be strike that and preserve everything else that is clear. And all those other things are clear, and there certainly should have been discovery, if there were any dispute at the margins about whether or not they're indeterminate. If we've — and it's also, I think, given that my co-counselor here, my friend here, says that there are $650 million we demanded in parts and only $150 million order, I think that shows that there is a dispute as to what wasn't transitioned to us but should have. In terms of Exhibit B, Exhibit B doesn't actually set the prices or determine the parts that are covered. It merely records them. And that is clear from the contract itself because, once again, first it says, here's what the goods means, what it shall mean. And second, if you look at Section 5 and 5.1 and 5.2, that actually tells you how to price things. And it says that the initial pricing is at white — excuse me, at defendant's cost, their actual cost, and in some instances, less 10 percent, or the amount set on the purchase order or acceptance in quotes. So something else determines the price. Exhibit B merely lists the prices. And right at the outset of the case, we actually did send over an Exhibit B, a partial Exhibit B. And we said, look, if you have any problems with this, tell us within 10 days. And there was actually no response to that. So our problem in sending Exhibit B was lack of cooperation from defendants, but that isn't the core of the case. The core of the case is, can the parties, can you determine what this contract covers, what its scope? And the contract itself sets forth a clear scope, and the district court simply erred in thinking it needed the platonic ideal, no mechanical application as to what's covered. Finally, on the settlement. The purpose of Exhibit B was simply to record, as you say. I mean, why did the parties include it twice? It seems like its importance is a bit more than merely recording, as you indicated. Yeah, so the parties did, on the settlement random, do it, record it twice. Just because it was a — they went to it in the settlement random, because it was a point of contention in the initial one, because we did not feel we got the cooperation in terms of access to their data in order to create an Exhibit B, and the parties were supposed to do it again in the settlement, and ultimately failed to do it. But the settlement, again, doesn't displace the scope in Section 2.1.2, and I think you can tell that from the settlement itself. Section 14 says, the agreement, except as otherwise modified in urine, shall continue in force and effect. And there's nothing in there, nothing in the settlement, that says that 2.1.2, the definition of goods, is superseded, is narrowed. It says nothing of the sort. And, in fact, if you go to course of performance, and, again, we would have more of this if there had been discovery, but if you — EHP's Commodity Director, Alberto Padilla, after settlement confirmed Electrolux's intention to transition every part which falls under Section 2.1.2 of our agreement. And that's — and, again, after its entry, Kim Rio, EHP intends — needs to award all faster-than-sea parts to White Salt according to our contract. And Lynn Knudson, who's EHP's Purchasing Director, per our White Salt agreement, there was a direction to move all classy items to White Salt. And a discussion about — Why would the agreement be seen as a narrowing of disputes about what the initial contract already said? Because if it had meant to narrow 2.1.2, it would have said, 2.1.2 is superseded in the following respects. And it doesn't. Maybe not narrow the contract, but narrow the disagreement about what the contract said. Do you see the difference between — Absolutely. And it did in many respects because it made clear, for example, that wire forms are covered, because it says the brewing matrix and wire form parts will be transitioned by such-and-so date. It made clear that a particular plant was covered because it said that they shall transition that plant by another date. So it did address some of the disagreements. But it didn't say we're going to take this extensive definition of specific parts, clamps, spacers, fasteners, et cetera, and we're going to absolutely get rid of that and we're going to narrow it down to the parts that are already transitioned and parts that are in the process of being transitioned. But the parties knew at that time that there was a wider range of disputes. Am I correct about that? That's correct. And there's a part of the settlement agreement that says this doesn't resolve the following disputes and included things like price increases, et cetera. And it said we're going to set those aside. But this resolves the disputes that were then up to date, which is whether or not the particular plant parts were covered or the parts for a particular plant were covered and whether or not wire forms and Brunner matrix parts were covered. Does the agreement say, I don't think I remember it saying, but does the agreement say that any further disputes about the nature of the goods were also reserved or did it omit such a statement? I don't think it said that, but it had a clause that required the parties to continue performance if other disputes arose. So they did make clear that they anticipated that this is an expansive agreement. This is a requirements contract. Disputes can arise. And so they covered themselves by saying continue to perform even when those disputes arise. Were some of those disputes outstanding at that time? Would you say that this agreement resolved the disputes that the parties had at that time and left room for future disputes to arise? I think that's true. Or did you say that there were some preexisting disputes that were not resolved in this agreement? So other than the agreements that it resolved in our favor and the agreements that it said, this does not cover those agreements, I think it resolved everything the parties thought were in dispute at that time. Now, maybe they were latent disputes. Maybe there were future disputes. But there was an effort to comprehensively resolve those disputes. But it wasn't something that said, the definition of goods, 2.1.2, set that aside. We're going to narrow it. And it simply doesn't make any sense to read it that way, especially in light of what came later. And finally, the district court in saying that wire forms are parts in the process of being transitioned, that that's indeterminate as well, that was also error because it was inconsistent with the Georgia principles that Your Honor has cited. If the court has no further questions, thank you very much.